794 So.2d 518 (2001)
In re REPORT OF the FAMILY COURT STEERING COMMITTEE.
No. SC00-1410.
Supreme Court of Florida.
May 3, 2001.
Rehearing Denied August 31, 2001.
Raymond T. McNeal, Chair, Family Court Steering Committee, Ocala, FL; Terrence P. O'Connor, Chair, Family Law Rules Committee of The Florida Bar, Fort Lauderdale, FL; B. Elaine New, Senior Attorney, Department of Legal Affairs and Education, Office of the State Courts Administrator; and Nushin G. Sayfie, Assistant Public Defender, Second Judicial Circuit, Tallahassee, FL, on behalf of the Governor's Task Force on Domestic Violence, for Petitioner.
Blaise Trettis, Viera, FL; Charles J. Kahn, Jr., Chair, Rules of Judicial Administration Committee, and John F. Harkness, Jr., Executive Director, The Florida Bar; Paula L. Walborsky, Tallahassee, FL; Celina Rios, Director, Family Division, Eleventh Judicial Circuit of Florida, Miami, FL; Howard M. Camerik, President, Florida Legal Services, Inc., Boca Raton, FL; and Nancy Daniels, Public Defender, Second Judicial Circuit, Tallahassee, FL, and Bennett H. Brummer, Public Defender and John E. Morrison, Assistant Public Defender, Eleventh Judicial Circuit, Miami, FL, on behalf of the Florida Public Defender Association, Responding.
PARIENTE, J.
This matter is before the Court based on the June 29, 2000, petition filed by the Family Court Steering Committee ("Committee").[1] The petition was filed in response *519 to a directive from this Court in In re Report of the Commission on Family Courts, 633 So.2d 14, 19 (Fla.1994) ("Family Courts II"), in which this Court asked the Committee to, among other things, develop recommendations "on the characteristics of a model family court including organization, policy, procedures, staffing, resources, and linkages to the community." Through this petition, the Committee asks this Court to adopt its recommendations for a model family court for Florida. These recommendations represent several years of work by the Committee members, who have given their unanimous support and approval to the model family court proposal.[2]
Having reviewed the Committee's recommendations, we strongly endorse the guiding principles and characteristics of the model family court developed therein and we reaffirm our commitment to the principles we espoused in In re Report of Commission on Family Courts, 588 So.2d 586, 587 (Fla.1991) (Family Courts I) and Family Courts II. In so doing, our goal continues to be the creation of "a fully integrated, comprehensive approach to handling all cases involving children and families," Family Courts II, 633 So.2d at *520 17, while at the same time resolving family disputes in a fair, timely, efficient, and cost-effective manner. We also stress the importance of embracing methods of resolving disputes that do not cause additional emotional harm to the children and families who are required to interact with the judicial system. As the number of family court filings and post-judgment matters continues to skyrocket, we also must seek to enhance judicial productivity and conserve judicial resources.[3] There will never be a "one size fits all" model, but the recommendations that the Committee submitted and that we endorse through this opinion represent a compilation of the best practices for the operation of a family court in Florida. Adoption of these recommendations will constitute a crucial step in enabling the judicial system to achieve these important goals.

HISTORICAL PERSPECTIVE
Ten years ago, with the Legislature's creation of the Commission on Family Courts ("Commission"), this State embarked on a mission to improve the resolution of disputes within the judicial system for children and families. When it created the Commission, the Legislature directed it to: (1) develop specific guidelines for the implementation of a family law division within each judicial circuit; (2) provide recommendations for statutory, rule, and organizational changes; and (3) recommend necessary support services. See Family Courts I, 588 So.2d at 587.
The Commission submitted to this Court a detailed report emphasizing not only the implementation of a family law division within each judicial circuit, but also the need for providing support services, furnishing additional court personnel, and developing criteria for the assignment of family law judges. As one of the necessary "proper resources" to fulfill the responsibilities of a family court, the Commission included "domestic violence assistance programs; guardians ad litem to represent dependent children and children in contested custody cases; home assessment services; sufficient staff to operate enforcement of support services; and case coordination/receptionist staff." Id. at 588-89. As explained in the report:
A fully staffed mediation program is essential in these types of proceedings. It has now been clearly established that mediation can resolve a high percentage of these disputes if they are brought before a competent mediator at an early stage of the proceeding. The fact that the mediation service is court-connected is important because it presents the mediator to the parties as a person who will be fair and impartial because of being an arm of the court.
Child assessment services and enforcement of support services must be available for all types of cases within the family division. There is no justification for child assessment services that are available only in juvenile dependency matters and not available when the same type of decision is being made in a dissolution-custody proceeding. Nor is there any justification for there to be a substantial difference in the handling of enforcement of support matters for Title IV cases as distinguished from non-Title IV cases. The underlying basis for the actionthat the child is not receiving supportis the same and the service should be the same.
Id. at 589.
This Court issued an opinion approving the Commission's recommendations. See *521 id. at 586. In particular, with regard to the jurisdiction of the family division, this Court stated:
We emphasize our support for the recommendation that there be a means to assign all family court matters that affect one family, including dissolution of marriage, custody, juvenile dependency and delinquency proceedings, to one judge. In approving these recommendations, we note the need for each circuit to design a family division to best serve its particular area. Geography, population, and available facilities are all factors that must be considered in tailoring a family division to the needs of a particular circuit.
Id. at 591. Accordingly, we held that "each judicial circuit should develop a local rule establishing a family division in its circuit or a means to coordinate family law matters that affect one family if the circuit... is unable to administratively justify such a division." Id. Based upon this directive, all circuits submitted to this Court a local rule or administrative order. See Family Courts II, 633 So.2d at 16.
The local rules and administrative orders submitted by the circuits suggested that this Court needed to further clarify its intent and expectations of the family court concept. See id. Accordingly, in 1994, after receiving input from a statewide Family Court Workshop,[4] the Court issued a second opinion "to further refine and implement the family court divisions of the circuit courts." Id. at 16. In that opinion, the Court emphasized that the goal of a family court was "to establish a comprehensive approach coordinating all judicial efforts in cases affecting the same family, regardless of the sometimes necessary geographical separation of courthouse facilities or the manner in which dockets for different types of cases are structured and managed." Id. at 17. In particular, the Court stated:
To better accomplish this goal, a family's interaction with the courts in all circuits shall be administratively coordinated and monitored in one unified family division, whether that interaction involves dissolutions of marriage (and attendant determinations of custody, visitation, child support, alimony, and modifications thereof), cases under the Uniform Child Custody Jurisdiction Act and the Uniform Reciprocal Enforcement of Support Act, adoption and paternity, domestic and repeat violence, juvenile delinquency and dependency, termination of parental rights, or cases of children or families in need of supervision.
Id. The Court also emphasized that trial courts must
coordinate and maximize court resources, such as guardians ad litem, mediation, law clerks, and computer systems, for the benefit of children and families in litigation and establish necessary linkages with community-based resources, including substance abuse treatment counseling, specialized training and parenting courses, and social services.
Id. In order to accomplish these goals, the Court identified the need for a case management staff to screen, evaluate, and manage cases through the system and an administrative judge in each circuit to oversee the development of the family division. See id. In Family Courts II, the Court also created the Family Court *522 Steering Committee to, among other things, advise the Court about the circuits' responses to families in litigation and make recommendations on the characteristics of a model family court. See id. at 18-19.[5]

REVIEW OF THE COMMITTEE'S RECOMMENDATIONS
Based upon that directive, the Committee developed the recommendations proposed here, which represent the Committee's concept of the best practices for a model family court in accordance with its study of nationwide trends in this area. Each of these recommendations is listed below, and the Committee's entire proposal, including the commentary for each recommendation, is set forth fully in the appendix to this opinion. We now review each of the recommendations in turn.
Recommendation # 1Family Court Guiding Principles
The Florida Supreme Court should adopt the following guiding principles as a foundation for defining and implementing a model family court:
1. Children should live in safe and permanent homes.
2. The needs and best interests of children should be the primary consideration of any family court.
3. All persons, whether children or adults, should be treated with objectivity, sensitivity, dignity and respect.
4. Cases involving inter-related family law issues should be consolidated or coordinated to maximize use of court resources to avoid conflicting decisions and to minimize inconvenience to the families.
5. Therapeutic justice should be a key part of the family court process. Therapeutic justice is a process that attempts to address the family's interrelated legal and nonlegal problems to produce a result that improves the family's functioning. The process should empower families through skills development, assist them to resolve their own disputes, provide access to appropriate services, and offer a variety of dispute resolution forums where the family can resolve problems without additional emotional trauma.
6. Whenever possible, parties and their attorneys should be empowered to select processes for addressing issues in their cases that are compatible with the family's needs, financial circumstances, and legal requirements.
7. The court is responsible for managing its cases with due consideration of the needs of the family, the litigants, and the issues presented by the case.
8. There should be a means of differentiating among cases so that judicial resources are conserved and cases are diverted to non-judicial and quasi-judicial personnel for resolution, when appropriate and consistent with the ends of justice.
9. Trial courts must coordinate and maximize court resources and establish linkages with community resources.
10. The court's role in family restructuring is to identify services and craft solutions that are appropriate for long-term stability and that minimize the need for subsequent court action.
11. Court services should be available to litigants at a reasonable cost and accessible without economic discrimination.

*523 12. Courts should have well trained and highly motivated judicial and non-judicial personnel. 

Analysis
These twelve guiding principles capture the essence of the initial recommendations of the 1991 Legislative Commission as well as this Court's opinions in Family Courts I and Family Courts II. In addition, these guiding principles are consistent with the mission of the judicial system in this arena as identified by the Committee:
[T]o provide families and children with an accessible and coordinated means of resolving legal matters in a fair, efficient, and effective manner. In addition to adjudicating disputes and providing alternative methods of dispute resolution, the Family Initiative will assist in meeting the needs of families and children involved in the court system by offering appropriate court-related services and linkages to community service providers.
These guiding principles are also in accord with the results of a statewide conference convened by this Court in 1993, which was entitled, "21st Century Justice: Guiding Florida's Courts into the Future." Participants in that conference, including attorneys, judges, court personnel, and members of the public, came together to develop consensus regarding the mission of the judicial system. This consensus included certain common themes for the judicial system in the family arena, including an affordable system (both to the litigants and to society); a system that provided nonadversarial alternatives and flexibility of alternatives; a system that preserved rather than destroyed family relationships; a system that empowered parties to make their own decisions; and a system that facilitated the process chosen by the parties. These guiding principles are also in accord with the spirit of the American Bar Association's Policy on Unified Family Courts, which it adopted in August 1994.[6]
The Committee's recommended guiding principles also are consistent with the legislative policy in section 61.001, Florida Statutes (2000), which provides that the purpose of chapter 61 (the chapter concerning dissolution of marriage, support, and custody) is: "(a) To preserve the integrity of marriage and to safeguard meaningful family relationships; (b) To promote the amicable settlement of disputes that arise between parties to a marriage; and (c) To mitigate the potential harm to the spouses and their children caused by the process of legal dissolution of marriage." § 61.001(2)(a)-(c). The Committee's principles do not conflict with other legislative policies regarding dependency cases in section 39.001(1), Florida Statutes (2000); delinquency cases in section 985.02, Florida Statutes (2000); or domestic violence cases in section 741.2902, Florida Statutes (2000).
Accordingly, we endorse each of these guiding principles. As explained in the Committee's commentary to this recommendation:
The welfare of children and families, non-adversarial dispute resolution, and providing related social services is at the heart of all of the family reform initiatives we studied, e.g., H.B. 3196, Oregon House of Representatives (1995). The emotional trauma of divorce and separation on parents and their children is well documented. In most cases, children need both parents. There is a general feeling, in the Committee and around *524 the country, that the traditional adversarial process is detrimental to children because it drives parents farther apart at the time their children need them to work together to restructure their system of parenting. There is also a feeling that the fragmented legal system is damaging to families. The legal system should focus on the needs of children who are involved in the litigation, refer families to resources that will make their relationships stronger, coordinate their cases to provide consistent results, and strive to leave families in better condition than when they entered the system. The Committee envisions a new and more important problem solving role for lawyers as they adapt their practices to these ideals.
These guiding principles do not rule out adversary litigation. The Committee recognizes that the adversary system is sometimes essential to resolve sincere differences of opinion, to balance power in relationships, and to enforce orders on recalcitrant parties. The adversary system is essential to protect due process rights of children who are charged with delinquent acts. Furthermore, the goal of therapeutic jurisprudence does not rule out retribution for criminal acts such as domestic violence and delinquent behavior. Frequently, retribution is used together with education and counseling to accomplish therapeutic results. Drug courts and domestic violence courts are examples of this process.
Although the guiding principles may appear more directed to domestic relations cases, they are applicable to all cases included in the model family division.
(Emphasis supplied.)
We emphasize that our endorsement of these guiding principles in no way changes our view that the primary role of the judge is to enforce and uphold the rule of law. Nonetheless, we recognize that in the family court, it is not always the legal issue itself that is time-consuming or complex, but rather it is often the underlying issues such as drug abuse, domestic violence, and family dysfunction that may cause the legal dispute to become time-consuming and complicated.[7] We also recognize that these underlying issues may form the basis for the family's multiple and interrelated interactions with the judicial system from dissolution to dependency to delinquency.
As to the specific suggestions of the Governor's Task Force on Domestic Violence, we request that the Family Court Steering Committee generally, and its Domestic Violence Subcommittee in particular, consider whether to incorporate the additional guiding principles suggested by the Task Force.[8] Our request is in accordance with Chief Justice Wells' Administrative Order that extended the term of *525 the Committee through June 30, 2002. ("Over the next two years the committee shall give priority to the following tasks.... 4. Conduct an assessment of how courts are handling domestic violence cases and develop recommendations for model practices for handling these cases in a manner that helps ensure the safety of victims and children.").
Recommendation # 2Family Division Structure and Jurisdiction

Recommendation # 2(a)Structure. A model family court or division should include the following types of cases:
 dissolution of marriage
 division and distribution of property arising out of a dissolution of marriage
 annulment
 support unconnected with dissolution of marriage
 paternity
 child support
 URESA/UIFSA
 custodial care of and access to children
 adoption
 name change
 declaratory judgment actions related to premarital, marital, or postmarital agreements
 civil domestic and repeat violence injunctions
 juvenile dependency
 termination of parental rights
 juvenile delinquency
 emancipation of a minor
 CINS/FINS
 truancy
 modification and enforcement of orders entered in these cases

Analysis
We specifically approve the recommendations regarding the enumerated cases that shall be included within the family division of each circuit. The types of cases recommended to be included within a model family court are consistent with our precedent as specifically endorsed in Family Courts II, 633 So.2d at 18, which included juvenile dependency and delinquency within the family court. Indeed, broad jurisdiction over all problems involving a single family is one of the key components of a unified court. See Catherine J. Ross, The Failure of Fragmentation: The Promise of a System of Unified Family Courts, 32 Fam. L.Q. 3, 15 (1998).
The chief judge and five other judges from the Eleventh Judicial Circuit[9] jointly filed a comment recommending that this Court "leave to the discretion of the Chief Judges whether to include or segregate the criminal misdemeanor component of the Domestic Violence Court in accordance with the best interest of each individual circuit." The Eleventh Judicial Circuit judges added that the experience of the Domestic Violence Court in their circuit "has demonstrated the necessity of including criminal misdemeanor cases within the Domestic Violence Court."
Despite this concern, there does not appear to be any real disagreement on this issue between the Committee and the comments of these Eleventh Judicial Circuit judges. Although criminal misdemeanor violations related to domestic violence are not a mandatory part of a model family court, the commentary to the Committee's recommendation indicates that there is more than one acceptable way to address criminal domestic violence cases and it recognizes that including criminal domestic violence as part of a family division could be acceptable. Thus, the Chief Judge of each circuit has the flexibility to include criminal misdemeanor domestic violence *526 cases in the family division, but the circuit is not required to do so. Nevertheless, we recognize that the Committee continues to study the best practices for handling all cases involving domestic violence, which could result in additional recommendations concerning the preferred method of coordinating criminal misdemeanor domestic violence cases with other related family court cases.
Recommendation # 2(b) Jurisdiction.
The Florida Supreme Court should adopt a rule of judicial administration that requires judges who are assigned to different cases involving the same family to confer, and to coordinate pending litigation to maximize judicial efforts, avoid inconsistent court orders, and avoid multiple court appearances by the parties on the same issues. This rule should clarify what happens when the judges disagree after conferring.
Coordination of cases is critical. Indeed, in 1991, the Commission on Family Courts noted that there is "no justification to have situations such as have been presented to the commission which indicate that families were required to appear before one judge in a dissolution proceeding that included determination of custody of the children and at the same time to have a hearing before another judge concerning the juvenile dependency of one of the children including the determination of the custody of that child." Family Courts I, 588 So.2d at 588.
Because a specific rule has not been submitted, we refer this important matter back to the Family Court Steering Committee for the development of appropriate standards to be followed when there are multiple court appearances in different cases by the parties on the same issue. Some specific aspects the Committee should consider are whether there should be notice to the parties when cross-over cases[10] are identified before consolidation or coordination occurs and whether the confidentiality requirements in chapter 39 (regarding dependency cases) will restrict the ability of the court to coordinate these cases.
Of course, if all cases involving the same family are identified and assigned to a single judge, many of these problems of coordination and confidentiality will be eliminated. As the Committee's commentary observes:
Automatic transfer avoids any complaint about ex parte communication between the judges. See Chaddick v. Monopoli, 714 So.2d 1007 (Fla.1998) (judges must allow parties to be present during conference on interstate jurisdiction). It also avoids any dispute over the chief judges' authority to resolve these issues.
Because of the broad jurisdiction of our circuit courts, which includes jurisdiction over all of the types of cases listed above, coordination of cases, and more particularly assignment to one circuit court judge, can be accomplishedprovided that the technology and necessary staff is in place to identify the related cases.
Recommendation # 3Essential Elements
The following twelve elements are essential or fundamental to a model family court:
 Case ManagementSupervising, coordinating, directing, and overseeing the process and progress of a case.
 Self-Help ProgramsProviding intake, screening, and procedural guidance to self represented litigants in family law cases.
 Domestic ViolenceEnsuring that cases involving domestic violence are identified and managed in a manner that is organized, timely, and sensitive *527 to the special dynamics involved in these cases.
 Alternative Dispute Resolution (ADR)Offering alternatives to reduce the trauma of traditional adversarial litigation process.
 Guardian ad LitemUtilizing guardians ad litem in all family cases involving abused, abandoned or neglected children, and children at risk of harm.
 General Masters/Hearing Officers Using quasi-judicial officers to expedite hearings and expand judicial resources.
 Custody EvaluationProviding the court with evaluative information in proceedings involving custody disputes.
 Supervised VisitationPromoting the utilization of qualified programs for supervised visitation and/or monitored exchange.
 Education Programs for Parents Utilizing education programs for parents involved in family law proceedings.
 Counseling Services/Treatment Programs Assuring the availability of crisis intervention and long-term counseling/treatment programs and ensuring that compliance is monitored when such
services are court ordered.
 SecurityProviding adequate and sufficient security personnel and equipment to ensure that family divisions are safe environments for judges, non-judicial staff, and the public.
 TechnologyProviding computer hardware, systems, and training to access information essential to case management and coordination, to print forms and notices immediately, and to generate statistical reports, to provide public and inter-agency access to records, and to allow teleconferencing and appearance of witnesses by electronic means. 

Analysis
We wholeheartedly endorse each of these essential elements to the successful function of a model family court. Specifically, as to Self Help Programs, we note that an overwhelmingly large percentage of litigants in family law matters are unrepresented. Approximately 65% of initial filings in domestic relations cases involve self-represented litigants and 80% of postjudgment proceedings in domestic relations cases involve at least one unrepresented litigant.[11]See In re Amendments to the Fla. Family Law Rules of Pro. (Self Help), 725 So.2d 365 (Fla.1998) (explaining that these figures were submitted in the Committee's petition). In response to the pressing need to provide access to the courts in a meaningful manner, self-help programs were developed in all circuits. At the Court's request, the Committee proposed, and the Court adopted, a procedural rule to guide self-help programs in all of the circuits as to permissible activities. See id.[12]
Although we endorse these essential elements, we also note that the failure to adequately fund the necessary services ultimately will result in the failure of the model family court concept.[13] Without the *528 necessary support services, the family court will be no more than a division of the circuit court that handles a specified class of cases, and the judicial system will be unable to effectively address the ever-increasing and complex needs of children and familiesand the ever-increasing caseloads.[14] With the necessary resources and proper funding, anticipated benefits from the implementation of the model family court include: (1) reducing the impact of inconsistent orders on law enforcement, witnesses, and the parties; (2) encouraging agreed-upon resolution of issues, thereby reducing the judge's time in each case; (3) reducing the need for future modification or enforcement proceedings; (4) reducing the overall time that a family is in court, thereby minimizing the disruption to the litigants and their employment, and (5) reducing the duplication of services.
Recommendation # 4The "Coordinated Management" Model
# 4(a)Management Model. The Florida Supreme Court should adopt a family court model based on "coordinated management."
# 4(b)Intake and Referral (including Self-help Program). The Florida Supreme Court should require each circuit to establish an intake process to provide information, make referrals to legal or social services, and assist self-represented litigants. Services should be available whether or not the person files a lawsuit and without regard to income.
# 4(c)Case management. Family division judges must have sufficient case management staff to perform differentiated case management, to coordinate all cases involving a single family, to coordinate and monitor services provided to each family, and to collect aggregate data to measure performance of the family division.
# 4(d)Technology. The court needs an integrated management information system to monitor and coordinate cases in the family division. The system should be integrated with the clerk of court and be able to provide information on all pending and closed cases involving the members of a family.
# 4(e) Model Court Diagram. The following diagram is a visual representation of how the model court will process public requests for information and assistance and manage and coordinate litigation. 

Analysis
The "coordinated management" model is the heart of the Committee's model family court recommendations. The Committee included a diagram as Recommendation 4(e) that provides a visual representation of how the model court will process public requests for information and assistance, as well as how the model will manage and coordinate litigation.[15] As the commentary to that recommendation indicates:

*529 Case management and coordination is a defining characteristic of a model family court. Case managers inform the family of voluntary services, refer the family to mandatory court programs, and coordinate all cases involving the family to maximize judicial resources, avoid inconsistent court orders, prevent multiple court appearances by the parties on the same issues, and monitor compliance with court-ordered services. Case management staff provides continuity within the system by ensuring that all cases involving a single family are assigned to the same judge or by active oversight by the case management team.
Recommendations # 4(b), Intake and Referral and # 4(c), Case Management: Among other things, the coordinated management model includes a front-end intake process to provide information, make referrals to legal or social services and assist self-represented litigants. See Recommendation # 4(b). Effective front-end management allows for litigants to become educated about the system and is crucial to the effective utilization and coordination of both community services and court resources. The services a child receives should be dictated by the individual needs of the child and not the particular door of the courthouse through which the child enters. Effective case management will enable this goal to be realized. To that end, the model recognizes that family division judges must have sufficient case management staff to perform differentiated case management, to coordinate all cases involving a single family, to coordinate and monitor services provided to each family and to collect aggregate data to measure performance of the family division. See Recommendation # 4(c).
We also emphasize that case management does not simply mean scheduling cases on a judge's docket. Rather, case management includes multiple aspects such as case differentiation, coordination, and monitoring. Case differentiation means that a case should be evaluated at the outset to determine the appropriate resources for that case and the appropriate way to handle that case. Case coordination requires that the judicial system identify all cases involving that family. Case monitoring requires a continued attention to the needs of the children and family as the case moves through the judicial system so that the appropriate court resources are made available and linkages to appropriate community resources are facilitated. All of these aspects are critical because in so many family cases, as acknowledged in Recommendation 1, Guiding Principle 5, recognition of the family's interrelated legal and nonlegal problems will produce a result that improves the family's functioning, empowers families to resolve their own disputes, and assists families in resolving problems without additional emotional trauma.
The model recognizes the importance of coordinating multiple cases involving one family, whether that is accomplished by the "one family, one judge" or the "one family, one team" approach, in order to both maximize resources and minimize the likelihood of inconsistent orders and conflicting approaches. As the commentary explains, under this model, "all pending family cases are coordinated and managed by a staff member or team of staff members to facilitate the delivery of appropriate social services, maximize judicial resources, avoid conflicting court orders, and prevent multiple court appearances by the parties on the same issues."
Under this model, the judge's role of performing these nonjudicial duties and providing continuity to the family is shifted to a staff member or team of staff. Thus, judges should be able to conserve their *530 time and energy for "what judges do bestresolve issues properly determined by the adversary process and fashioning appropriate remedies." Ross, supra, at 17. It is hoped that as the model is implemented, the model family court will slow the demand for new judges in the family division.
Recommendation # 4(d), Technology: The key to fair, timely, consistent, efficient, and effective handling of multiple cases related to one family begins with the ability of the judicial system to be aware of all related cases involving that family. Thus, technology is essential to the functioning of a model family court. Technology is recognized both as an essential element of the model family court and as a critical component of the coordinated management model.
Central to the success of the model is the need for an integrated management information system to coordinate and monitor cases in the family court. That information system should be integrated to provide information on all pending and closed cases involving the members of a family. Among other things, the recommendation advises that the information system should have the capacity to:
 provide automatic calendar management
 monitor significant case events and generate automatically an appropriate order or notice
 maintain a complete history of the family's involvement in the court system
 allow retrieval of documents contained in the court file
 capture statistical data needed for reports
 search for records involving the same parties in all counties of the state
 allow courtroom data entry as proceedings are conducted
 allow for teleconferencing and appearance of witnesses by electronic means
 allow interagency and public access to appropriate information
Thus, the commentary states that "the family court's need for technology is a priority. Without appropriate technology, the court cannot obtain the information necessary to manage and coordinate cases effectively." We strongly agree.
At the present time, several committees both inside and outside of the Court are working on the issue of coordination of technology initiatives with an aim to serving the needs of the family court system.[16] Technology must be coordinated on a statewide basis to maximize its effectiveness, to take advantage of economies of scale, and to ensure that resources are not duplicated. We stress the importance of the specific and multiple needs for technology in the family court system and request *531 that the Committee take the necessary steps to further make the appropriate committees aware of these needs. Accordingly, we endorse the Coordinated Management Model.
Recommendation # 5Administrative Structure
# 5(a)Local Rule. The Florida Supreme Court should require each circuit to implement a unified family division consistent with this model by a new local rule or administrative order approved by the Florida Supreme Court. 

Analysis
In Family Courts III, this Court approved local rules and administrative orders establishing family law divisions in each of the circuits. 646 So.2d at 182. The Court required that any deviations or amendments be submitted before the changes were implemented. See id. However, because of the passage of time and because of the experience learned from the actual operation of the family division in each circuit, we direct each circuit to submit a revised local rule or administrative order consistent with the recommendations approved by the Court in this opinion no later than January 1, 2002. The Court's direct approval of these rules shall be in lieu of the usual procedure for the approval of local rules set forth in Rule of Judicial Administration 2.050, and these rules shall be treated as an exception to that rule. See Family Courts III, 646 So.2d at 182.
# 5(b)Administrative Judge. The Florida Supreme Court should require the chief judge of each circuit to appoint an administrative family law judge for the circuit and give the administrative judge authority to oversee and coordinate the circuit's family initiative. The chief judge may appoint associate administrative judges for individual counties or specialized divisions, such as domestic relations, domestic violence, juvenile dependency, or juvenile delinquency, but these associate judges shall report to the administrative judge of the family division.
# 5(c)Family Court Administrator. Each circuit should employ at least one family court administrator or coordinator to assist the chief judge, trial court administrator, and administrative family law judge in the management responsibilities of the family division and in establishing linkages with appropriate community services and programs.

Analysis
The judges in the Eleventh Judicial Circuit object to Recommendation # 5(b) because they state that their delinquency and dependency division is several miles from their domestic violence and dissolution of marriage division. The objection notes: "Because of this geographic obstacle, it is important that our Chief Judge retain the discretion to appoint separate Administrative Judges for these Divisions." At the same time, in the comments submitted by the Eleventh Judicial Circuit judges, the judges have endorsed the concept of "one family, one team."
As Judge McNeal, the present chair of the Committee, pointed out in oral argument, the family law administrative judge is an extension of the authority of the Chief Judge, who is already authorized to appoint administrative judges to assist the Chief Judge. This authority is currently found in Rule of Judicial Administration 2.050(b)(5), which provides that "[t]he chief judge may designate a judge in any court or court division of circuit or county courts as `administrative judge' of any court or division to assist with the administrative supervision of the court or division."
This Court has previously required one administrative judge for the family division. See Family Courts II, 633 So.2d at 17 ("[A]n administrative judge must be appointed in each circuit to be directly responsible for administratively managing the family division"). Having an administrative *532 judge over the entire division helps to ensure the genuine coordination of cases and a coordinated approach to the overall handling of cases and utilization of resources. It does not prevent any circuit from retaining separate administrative judges for family, dependency, and delinquency cases. Accordingly, this Court continues to adhere to its earlier stated views in favor of one administrative judge being designated as responsible for the administration of the family division within each circuit and believes that when feasible and practical, this is the approach that should be implemented.
However, this Court also acknowledges that decisions as to the best approach in each circuit must be within the discretion of the chief judge who has the administrative responsibility for that circuit. Indeed, we recognize that in the smaller circuits, many judges in fact handle the whole array of family court cases from dependency to delinquency to dissolution to domestic violence, so that the judge is in fact the embodiment of the "one judge, one family" court. In multi-county circuits, the critical need for coordination may exist within the county but not necessarily across the circuit.
Accordingly, although we endorse the principle embodied in these recommendations, we decline to mandate the appointment of an administrative family division judge. Instead, we leave it to each circuit to devise a plan for coordination of cases within the family division to achieve the goals of the model family court. We urge the Family Court Steering Committee to work with the chief judges of each circuit to ensure the best practices for the administrative coordination of cases that will be suited to the needs of that individual circuit. In those circuits that have separate administrative judges for each separate division, we urge each judge to work cooperatively to ensure that there is a method for coordinating the circuit's family initiative and to ensure coordination of cases.
Recommendation # 6Family Law Judges
# 6(a) Judicial Commitment. The Florida Supreme Court should require chief judges to assign to the family division only those judges who are committed to children and families, and, to the extent possible, who volunteer to serve in the division.
# 6(b) Term in the Division. The Florida Supreme Court should encourage chief judges to assign judges to the family division for at least a three-year term, give them the opportunity to rotate out at the end of their term, and stagger rotation to ensure that a significant portion of the family division judges are experienced in family law.

Analysis
As we recognized in Family Courts I, "the assignment of a judge to family law cases is one of the most difficult and stressful of all the responsibilities of a circuit judge." 588 So.2d at 591. For that reason, we acknowledged the need for rotation among judges to the family division. However, since that time (and perhaps in part due to the enhanced resources provided in the family division), many judges have both volunteered for the family court division and have been willing to remain in this division. We applaud the commitment of these judges who have dedicated themselves to the family law division, despite the difficulty and stress involved. Thus, although we recognize the intent of both recommendations 6(a) and 6(b), we are concerned with the effect of these recommendations and whether they are consistent with Florida Rule of Judicial Administration *533 2.050(b)(3)[17] and (b)(4).[18] Accordingly, we refer these issues to the Rules of Judicial Administration Committee for consideration of an appropriate rule in coordination with the Family Court Steering Committee.
# 6(c) Preliminary Education. Judges who are assigned to the family division for the first time, or who have not served in the family division for two years, should receive mandatory training in the fundamentals of family law, domestic violence, juvenile dependency, and juvenile delinquency before assuming the assignment or within 60 days after assuming the assignment.
# 6(d) Continuing Education. Judges serving in the family division should be provided with continuing education in technical legal requirements of domestic relations and juvenile law, training in non-legal subjects such as child development, family systems, mental health, behavioral sciences, social work, mediation, and information on public benefits and programs that are available for children and families. 

Analysis
As we acknowledged in Family Courts I, for the family court system to fulfill its potential "judges must be committed to carrying out this judicial responsibility and willing to participate in education and training programs in this area of the law." 588 So.2d at 591. Thus, commitment, continuing education and training remains an important component of the family court concept.
The Governor's Task Force on Domestic Violence has expressed its support of this recommendation and notes that "the key to understanding domestic violence is training." However, Attorney Trettis filed an extensive comment strongly objecting to these two provisions.[19] He urges that "these recommendations should be excluded from a model family court plan because the recommendations assume that there is no disagreement about either the origins of domestic violence or about the most effective way to address domestic violence."
Our understanding of these recommendations is not to require education that espouses a single or narrow ideological view or restricts education to a single subject (e.g., domestic violence). Rather, we view these recommendations as one means of better equipping judges to address and understand the multiple nonlegal issues that come before them in the family law arena. We note that the Florida Court Education Council is charged with the responsibility of approving educational courses in accordance with neutral and objective principles and preventing any ideological imbalance in judicial education. With this proviso, we approve the Committee's recommendations and refer this specific recommendation to the Florida Court Education Council in order to develop appropriate courses to implement the recommendation.
Recommendation # 7Additional Family Court Staff
# 7(a)Staff Attorneys. Family division judges should have access to staff attorneys. 

Analysis
No comments have been filed as to this specific recommendation, but we note that *534 chief judges assign staff attorneys pursuant to their authority under Rule of Judicial Administration 2.050(b). Although we endorse this recommendation as an aspirational goal, we recognize that the chief judge must retain flexibility to make staff assignments, especially when allocating scarce resources.
# 7(b) Education and Training.
(1) Quasi-judicial officers should receive mandatory training in the fundamentals of family law, domestic violence, juvenile dependency and juvenile delinquency before assuming the assignment or within 60 days after assuming the assignment. They should be provided with continuing education in the area of assignment.
(2) All court staff should be well trained in both the family court operations as well as child development, family systems, mental health, behavioral sciences, social work, mediation, and information on public benefits and programs that are available for children and families. 
We approve this recommendation in principle, but find that in order to implement this recommendation, we require further details from the Committee as to how the training of court staff would take place, the type of recommended education programs envisioned, and the resources necessary to fund this training. Accordingly, we refer this recommendation back to the Committee for further development. 
Recommendation # 8Family Law Advisory Group
The Florida Supreme Court should require each circuit (county) to create a family law advisory group that is open to court staff, judges, members of the bar, social service providers, local community leaders and any other interested persons or organizations to support and advise the family court. 

Analysis
The success of any family court is dependent upon effective communication among all stakeholders both in the judicial system and in the community. Because the model court concept must be tailored to the needs of each community and because each family court should fully explore and take advantage of resources within the community, the creation of a Family Law Advisory Group within each circuit will enhance the family court in each circuit.[20] Only by open communication among court staff, judges, attorneys, social service providers, and other community leaders will the role and the goal of the family court truly be realized.
We request that each circuit report back to this Court on the progress of the Family Law Advisory Group no later than January 1, 2002, and annually thereafter, to enable this Court and the Committee to continue to monitor the practices in each circuit and enable the Court to assess and make available information on the best practices to all of the circuits. This annual report should be incorporated into the annual report mandated by this Court in Family Courts II, 633 So.2d at 18, which requires that each circuit submit to the Chief Justice an annual report on progress toward implementation of the family court initiative. Each circuit shall submit the combined annual report and the revision to the local rule or administrative order referred to in Recommendation # 5(a) by January 1, 2002.
Recommendation # 9Public Education The Florida Supreme Court should require each circuit to provide regular public information through the Internet and any other media that is easily accessible to the community about how to access the court, what services are available, what the public can expect from the legal system, and any limitations on the court's authority and resources. 

*535 Analysis
We note that some circuits already have extensive websites with information about the court system, as do several of the district courts of appeal and the Florida Supreme Court.[21] Although we encourage each circuit to provide this information using a variety of means, at this time we decline to require each circuit to do so. We note, however, that the Office of the State Courts Administrator is available to provide assistance to any circuit in performing this valuable public education function.
Recommendation # 10Family Court Summit
The Family Court Steering Committee should sponsor a Family Court Summit to develop plans to implement the Court's goals for the family court initiative. 

Analysis
A Family Court Summit attended by representatives of each circuit was held in September 2000 and thus there is no action required by the Court as to this recommendation. However, from the positive feedback received as a result of the summit, we are confident that each circuit has a better understanding of the goals for the family court and the importance of these goals. Also, the summit was utilized as a forum for explaining the availability of pilot money to implement the Model Family Court concept. Indeed, as part of the Committee's activities, the Committee sought and obtained approval from the Legislature to expend an additional $500,000 to fund pilot projects to further develop implementation of the model. Pilots have been awarded in Pasco and Pinellas Counties in the Sixth Judicial Circuit, a pilot has been awarded in Lee County in the Twentieth Judicial Circuit, and several other smaller "focus" grants also have been awarded.
We anticipate that the results of these pilots will provide valuable information to the Committee, to this Court, and to the circuits as to the actual implementation of the model family court. This information should include the basis for additional recommendations from the Committee to this Court on the best practices for the implementation of a model family court. This information also will assist in providing the details of the actual budgetary needs necessary to fully fund the model.

CONCLUSION
As the number of family court filings and post-judgment matters continues to increase, twenty-first century family courts need new and better ways to improve the resolution of disputes within the judicial system for children and families. It is essential that the courts' interactions with children and families promote public trust and confidence in the judicial system. By identifying and providing families access to appropriate court and community services and by offering a variety of dispute resolution forums where families can resolve conflict without exacerbating emotional trauma, the judicial system will promote the resolution of conflict and not facilitate conflict. If the judicial system encourages alternatives to the adversarial *536 process, empowers litigants to reach their own solutions, and assists in crafting solutions that promote long-term stability in matters involving children and families, the likelihood of future court intervention in the family should be decreasedwhether this be through minimizing post-judgment litigation or preventing the dependent child of today from becoming the delinquent child of tomorrow. Our ultimate goal remains to facilitate the resolution of disputes involving children and families in a fair, timely, effective, and costefficient manner.
In accepting the Committee's recommendations, we are not unmindful of the many resources required in order to make the model family court work. Indeed, as we stated before, "[t]he fact is that children and families in the courts cannot adequately be served within the existing resources." Family Courts II, 633 So.2d at 18. Our citizens deserve a court system with the necessary resources to protect our children and their families. We therefore direct that the Committee continue to develop details of the model family court and determine the resources necessary to implement the model statewide and to provide this detailed information to the Trial Court Budget Commission for assessing the budgetary requirements for statewide funding of the court system.
Although we realize thatas the saying goes"the devil is in the details," the model family court goes a long way towards incorporating the goals we have embraced. We therefore reaffirm our continued commitment to the broad principles espoused for a model family court in Florida and approve of the recommendations of the Family Court Steering Committee with the qualifications explained in this opinion. We thank the prior Committees for their years of hard work and thank the present Committee for its continuation of these efforts on behalf of Florida's families and children.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, LEWIS, and QUINCE, JJ., concur.

APPENDIX
A Model Family Court for Florida
Recommendations of the Florida Supreme
Court's
Family Court Steering Committee
June, 2000
The Honorable Karen Cole, Chair
Ms. Carol Lee Ortman (1998 99)
The Honorable Raymond T. McNeal (2000)
Chairs, Model Court Subcommittee
Staff support for the Family Court Steering
Committee is provided by the Office of
the State Courts Administrator
Copies of this report are available upon
request to:
Office of the State Courts Administrator,
Attention: Family Court Initiative
500 South Duval Street
Tallahassee, Florida 32399 1900
telephone: 850.922.5691
www.flcourts.org
A Model Family Court for Florida
Recommendations of the Family Court
Steering Committee
Introduction and Mission
In 1994 the Supreme Court of Florida directed the Family Court Steering Committee (FCSC) to develop recommendations on the characteristics of a model family court, including organization, policy, procedures, staffing, resources, and linkages to community services to assist children and families involved in litigation. In re Report of the Commission on Family Courts, 633 So.2d 14,19 (Fla.1994) (hereinafter *537 referred to as Family Courts II). In response, the Model Courts Subcommittee developed a court structure and policy that incorporates current trends in family law and the Committee's idea of an ideal family court. The FCSC used the following mission statement to define the overall purpose of the Florida Family Court Initiative and as a standard to measure the work of the Model Courts Subcommittee.
The mission of the Family Initiative is to provide families and children with an accessible and coordinated means of resolving legal matters in a fair, efficient, and effective manner. In addition to adjudicating disputes and providing alternative methods of dispute resolution, the Family Initiative will assist in meeting the needs of families and children involved in the court system by offering appropriate court-related services and linkages to community service providers.
Based on its investigation and analysis, the Family Court Steering Committee makes the following recommendations to the Florida Supreme Court:
Recommendation # 1-Family Court Guiding Principles
The Florida Supreme Court should adopt the following guiding principles as a foundation for defining and implementing a model family court:
 Children should live in safe and permanent homes.
 The needs and best interests of children should be the primary consideration of any family court.
 All persons, whether children or adults, should be treated with objectivity, sensitivity, dignity and respect.
 Cases involving inter-related family law issues should be consolidated or coordinated to maximize use of court resources to avoid conflicting decisions and to minimize inconvenience to the families.
 Therapeutic justice should be a key part of the family court process. Therapeutic justice is a process that attempts to address the family's interrelated legal and nonlegal problems to produce a result that improves the family's functioning. The process should empower families through skills development, assist them to resolve their own disputes, provide access to appropriate services, and offer a variety of dispute resolution forums where the family can resolve problems without additional emotional trauma.
 Whenever possible, parties and their attorneys should be empowered to select processes for addressing issues in their cases that are compatible with the family's needs, financial circumstances, and legal requirements.
 The court is responsible for managing its cases with due consideration of the needs of the family, the litigants, and the issues presented by the case.
 There should be a means of differentiating among cases so that judicial resources are conserved and cases are diverted to non-judicial and quasi-judicial personnel for resolution, when appropriate and consistent with the ends of justice.
 Trial courts must coordinate and maximize court resources and establish linkages with community resources.
 The court's role in family restructuring is to identify services and craft solutions that are appropriate for long-term stability and that minimize the need for subsequent court action.
 Court services should be available to litigants at a reasonable cost and accessible without economic discrimination.
*538  Courts should have well trained and highly motivated judicial and non-judicial personnel.

Commentary:
The Committee's list of guiding principles is more extensive than those adopted by other states, but they embody similar concepts. The welfare of children and families, non-adversarial dispute resolution, and providing related social services is at the heart of all of the family reform initiatives we studied, e.g., H.B. 3196, Oregon House of Representatives (1995). The emotional trauma of divorce and separation on parents and their children is well documented. In most cases, children need both parents. There is a general feeling, in the Committee and around the country, that the traditional adversarial process is detrimental to children because it drives parents farther apart at the time their children need them to work together to restructure their system of parenting. There is also a feeling that the fragmented legal system is damaging to families. The legal system should focus on the needs of children who are involved in the litigation, refer families to resources that will make their relationships stronger, coordinate their cases to provide consistent results, and strive to leave families in better condition than when they entered the system. The Committee envisions a new and more important problem solving role for lawyers as they adapt their practices to these ideals.
These guiding principles do not rule out adversary litigation. The Committee recognizes that the adversary system is sometimes essential to resolve sincere differences of opinion, to balance power in relationships, and to enforce orders on recalcitrant parties. The adversary system is essential to protect due process rights of children who are charged with delinquent acts. Furthermore, the goal of therapeutic jurisprudence does not rule out retribution for criminal acts such as domestic violence and delinquent behavior. Frequently, retribution is used together with education and counseling to accomplish therapeutic results. Drug courts and domestic violence courts are examples of this process.
Although the guiding principles may appear more directed to domestic relations cases, they are applicable to all cases included in the model family division.
Recommendation # 2-Family Division Structure & Jurisdiction
# 2(a) Structure. A model family court or division should include the following types of cases:
 dissolution of marriage
 division and distribution of property arising out of a dissolution of marriage
 annulment
 support unconnected with dissolution of marriage
 paternity
 child support
 URESA/UIFSA
 custodial care of and access to children
 adoption
 name change
 declaratory judgment actions related to premarital, marital, or postmarital agreements
 civil domestic and repeat violence injunctions
 juvenile dependency
 termination of parental rights
 juvenile delinquency
 emancipation of a minor
*539  CINS/FINS
 truancy
 modification and enforcement of orders entered in these cases

Commentary:
The structure of a family court is important only when it is essential to allow or expedite the process of case management and coordination. In Florida, the court has comprehensive jurisdiction at the highest state trial court level. See Ross, The Promise of a System of Unified Family Courts, 32 Fam.L.Q. 3, 15 (1998). The circuit court has subject matter jurisdiction to adjudicate, manage and coordinate all cases involving children and families except misdemeanor intra-family violence, misdemeanor violations of injunctions for protection, and juvenile traffic offenses. Whether or not these cases are part of the family division, they can be coordinated with existing family cases to achieve legitimate case management goals. The Committee has proposed pilot projects to develop models of best practice in monitoring, tracking, and coordinating cases in the family division and other litigation involving the same family members. The Committee believes that the pilot projects will result in recommendations on the best solution to this "administrative Frankenstein." In re Report of the Commission of Family Courts, 646 So.2d 178, 180 (Fla.1994) (Family Courts III).
Every type of litigation could involve children and families. If the Committee had included "all cases involving children and families" in the model, our existing court structure would be sufficient and the need for a family division questionable. The Committee limited the model to juvenile matters and traditional domestic relations cases. See Fla. Fam. L.R.P. 12.010(a)(1) (types of cases covered by Family Rules); See also Ankenbrandt v. Richards, 504 U.S. 689 [, 112 S.Ct. 2206, 119 L.Ed.2d 468] (1992) for a discussion on the types of cases that fall under the "domestic relations exception" to federal diversity jurisdiction. There are three primary reasons for this decision. First, there is a great deal of overlapping issues that can be addressed more efficiently if all of these cases are in the same division. Most of the cases involve the welfare of children who are not parties to the proceedings. As a result, the legal system, the parties, and the attorneys have a responsibility to protect the best interests of the children involved. See e.g., Standards 2.23, 2.26, Bounds of Advocacy: Standards of Conduct (AAML 1991). Finally, the objectives of therapeutic justice apply to all cases included in the model.
The FCSC voted to include juvenile delinquency in the model family court. This follows recommendations by the Florida Supreme Court, The Florida Bar Commission for Children, and the Governor's Constituency for Children. In re Report of the Commission on Family Courts, 588 So.2d 586, 590 (Fla.1991) (hereinafter referred to as Family Courts I); Family Courts II, 633 So.2d at 17 (proposed structure included juvenile delinquency and dependency, along with termination of parental rights, and children or families in need of services). It is also consistent with recommendations on unified family courts by other authorities. See Ross, The Promise of a System of Unified Family Courts, 32 Fam. L.Q. at 15 16 (describing the need for comprehensive jurisdiction). Supporters of this structure believe that integration of juvenile delinquency with other family civil proceedings is essential to the welfare of children. Delinquency cases are adversary proceedings in which the *540 best interests of the child and the welfare of the family are secondary to the child's constitutional rights. Nevertheless, a lot of dependent children are subject to prosecution in these courts, sometimes inappropriately, and it makes sense to coordinate services to the children and their families. It will be a challenge for the family court to coordinate services provided by the two agencies who are responsible for these children, the Department of Children and Families and the Department of Juvenile Justice.
The Committee does not recommend including criminal cases involving family members in the family division at this time. There are good arguments for and against including misdemeanor and felony domestic violence in a family division. Likewise, there are good arguments for dedicated domestic violence courts with jurisdiction over both civil and criminal domestic violence cases. Consequently, at this time, there is more than one acceptable way for the court system to address domestic violence in a comprehensive manner. Failure to include criminal cases involving family members will not preclude a circuit or county from establishing a domestic violence court with criminal jurisdiction as part of a family division or separate from, but coordinated with, the family division.
Even though some cases involving children and families are not included in the model, the court system has a duty to coordinate those cases with pending family cases to avoid inconsistent court orders. For example, an order in the dissolution case or civil domestic violence case may allow contact between the parties even though a bond condition or a sentence in the criminal case prohibits contact. A probate court could appoint a parent as guardian of the property to conclude a child's personal injury suit at the same time the juvenile court is removing the child from the parent's home and restricting contact because of alleged abuse. Results like these do not meet the needs of the family, the community, or the legal system and are unacceptable.
# 2(b) Jurisdiction. The Florida Supreme Court should adopt a rule of judicial administration that requires judges who are assigned to different cases involving the same family to confer, and to coordinate pending litigation to maximize judicial efforts, avoid inconsistent court orders, and avoid multiple court appearances by the parties on the same issues. This rule should clarify what happens when the judges disagree after conferring.

Commentary:
In Family Courts II the Florida Supreme Court directed family divisions to administratively coordinate and monitor a family's interaction with the court, to assign all cases involving the family to one judge when appropriate, and to keep judges handling different aspects of a family's litigation fully informed. Family Courts II, 633 So.2d at 17. The Committee's proposed model requires case coordination of all litigation involving a single family. Trial courts will need a procedure to resolve disagreements over how this should be accomplished when comity fails. See Abuchaibe v. Abuchaibe, 751 So.2d 1257 (Fla. 3d DCA 2000) (dissolution judge and domestic violence judge entered contrary orders).
The Supreme Court should direct judges to coordinate related litigation even though they disagree on how a case should be resolved. Disagreements could be resolved by the chief judge and different cases assigned to the same judge to avoid inconsistent rulings. A better solution is a system establishing case priority and automatic *541 referral. For example, Utah has a statute that provides for automatic transfer of cases involving custody, support, or visitation to the juvenile court when a child has a pending juvenile case. § 78-3a-105, U.C.A. Automatic transfer avoids any complaint about ex parte communication between the judges. See Chaddick v. Monopoli, 714 So.2d 1007 (Fla.1998) (judges must allow parties to be present during conference on interstate jurisdiction). It also avoids any dispute over the chief judges' authority to resolve these issues. See Norris v. State, 737 So.2d 1240 (Fla. 5th DCA 1999) (appellate court voided effect of administrative order designed to keep county judge from routinely changing circuit judges' bond orders).
Recommendation # 3-Essential Elements
The following twelve elements are essential or fundamental to a model family court:
Case Management-Supervising, coordinating, directing, and overseeing the process and progress of a case.
Self Help Programs-Providing intake, screening, and procedural guidance to self represented litigants in family law cases.
Domestic Violence-Ensuring that cases involving domestic violence are identified and managed in a manner that is organized, timely, and sensitive to the special dynamics involved in these cases.
Alternative Dispute Resolution (ADR)-Offering alternatives to reduce the trauma of traditional adversarial litigation process.
Guardian ad Litem-Utilizing guardians ad litem in all family cases involving abused, abandoned or neglected children, and children at risk of harm.
General Masters/Hearing Officers-Using quasi-judicial officers to expedite hearings and expand judicial resources.
Custody Evaluation-Providing the court with evaluative information in proceedings involving custody disputes.
Supervised Visitation-Promoting the utilization of qualified programs for supervised visitation and/or monitored exchange.
Education Programs for Parents-Utilizing education programs for parents involved in family law proceedings.
Counseling Services/Treatment Programs-Assuring the availability of crisis intervention and long-term counseling/treatment programs and ensuring that compliance is monitored when such services are court ordered.
Security-Providing adequate and sufficient security personnel and equipment to ensure that family divisions are safe environments for judges, non-judicial staff, and the public.
Technology-Providing computer hardware, systems, and training to access information essential to case management and coordination, to print forms and notices immediately, and to generate statistical reports, to provide public and inter-agency access to records, and to allow teleconferencing and appearance of witnesses by electronic means.
Recommendation # 4-The "Coordinated Management" Model
# 4(a) Management Model. The Florida Supreme Court should adopt a family court model based on "coordinated management."

Commentary:
In a coordinated management system, all pending family cases are coordinated and managed by a staff member or team *542 of staff members to facilitate the delivery of appropriate social services, maximize judicial resources, avoid conflicting court orders, and prevent multiple court appearances by the parties on the same issues. As a court grows to more than seven judges, it becomes inefficient to divide all cases equally among judges. It is more practical to assign judges to divisions. Because judges rotate in and out of divisions, it is impossible to keep one judge with the same family. In the coordinated management model, this is unnecessary. A staff member or team of staff provides continuity for the family instead of the judge.
This model does not exclude entirely the concept of "one family, one-judge." In many cases, appropriate coordination will require assignment of cases with overlapping issues to one judge. In others, the goals of case coordination and service delivery may be accomplished by the exchange of relevant information and judicial cooperation. Also, in counties or circuits with only a few judges, all cases may be split evenly, causing one family to be assigned to one judge.
# 4(b) Intake and Referral (including Self-help Program). The Florida Supreme Court should require each circuit to establish an intake process to provide information, make referrals to legal or social services, and assist self-represented litigants. Services should be available whether or not the person files a lawsuit and without regard to income.

Commentary:
Intake is the initial step in "coordinated management" for self-represented litigants and persons seeking information about the family court. See Family Courts II, 633 So.2d at 17 (case management staff must be available to help and direct families at the initial point of contact with the judicial system to the appropriate judge and/or appropriate services), American Bar Association Policy on Unified Family Courts (August, 1994). Although it will be used primarily by self-represented litigants, attorneys may refer clients to the intake office for information about court processes and programs, and for referral to appropriate resources. Assistance should be available whether or not the prospective litigant actually files a lawsuit. For example, a prospective litigant may want a list of attorneys who practice collaborative law, a list of certified family law mediators who provide pre-filing mediation, or parents may want to attend a class for divorcing or separating parents before deciding to file for dissolution of their marriage. The process will help fulfill the court's responsibility to make the family court accessible and to provide information at the initial point of entry that will empower families to select processes that are suitable for resolving their legal and social problems.
The intake process provides citizens with more than one point of entry into the legal system. The idea of a "multi-door courthouse" was first advanced by Frank E. Sander in a Pound Conference lecture in 1979. Sander, Varieties of Dispute Processing, The Pound Conference: Perspectives on Justice in the Future, (A. Leo Levin et al. eds 1979). A multi-door courthouse consists of a process by which an individual can locate the most appropriate method of resolving a dispute. There is one building, or courthouse, where individuals can go to obtain a multitude of services. The individual seeking assistance would first see an interviewer, called an Intake Specialist, who would help assess the problem. Thereafter the party would be directed to the most appropriate `door' for resolution of the problem. Behind *543 these doors an individual could find a number of processes including "mediation, arbitration, litigation and social services." Kimberly A. Kovach, Mediation: Principles and Practice (1994).
Intake staff will encourage prospective litigants to seek legal advice and will furnish information on legal services available in the community, including any low-cost or free services provided by the bar. If the litigant does not want legal advice, intake staff may provide approved forms, instructions, definitions, procedural information, and education to allow the litigant to proceed with their case in a more uniform and educated manner.
Intake staff will begin the process of case management on cases filed by litigants who enter the court system through the intake program. Staff will also inform litigants about case coordination procedures and elicit information on any other previous or pending litigation involving the same family members.
# 4(c) Case management. Family division judges must have sufficient case management staff to perform differentiated case management, to coordinate all cases involving a single family, to coordinate and monitor services provided to each family, and to collect aggregate data to measure performance of the family division.

Commentary:
Case management and coordination is a defining characteristic of a model family court. Case managers inform the family of voluntary services, refer the family to mandatory court programs, and coordinate all cases involving the family to maximize judicial resources, avoid inconsistent court orders, prevent multiple court appearances by the parties on the same issues, and monitor compliance with court-ordered services. Case management staff provides continuity within the system by ensuring that all cases involving a single family are assigned to the same judge or by active oversight by the case management team.
The initial step in case management is screening. All cases, whether they involve litigants representing themselves or litigants with attorneys, will be screened, managed, and monitored. Initial and continual screening should be performed by a case management team that includes not only staff trained in the operation of the family court, but also staff trained in the behavioral sciences who understand the dynamics of families in crisis. Screening and subsequent service referrals will ensure that all presenting issues are clearly focused and that families are provided with an opportunity to resolve their disputes before engaging in destructive adversarial litigation. See § 61.21(1)(d), Fla. Stat. (1999) (parents receive maximum benefit from parenting programs if they attend "at the earliest stages of their dispute before extensive litigation occurs and adversarial positions are assumed or intensified"). Screening will alert the court of the family's special circumstances, such as a history of domestic violence or the need to address emotional issues before the parties are expected to negotiate appropriate parenting plans and resolve other legal issues. Although the model stresses the importance of nonadversarial processes, in many cases, the adversarial process and resulting authoritative judicial decision are needed to address power imbalances and to ensure appropriate conduct by uncooperative parties.
As part of the screening process, staff may differentiate various time tracks for case disposition based on the level of complexity, need for discovery, need for services, or unusual emotional factors. Some families will have needs that require immediate *544 judicial attention such as issuing a domestic violence injunction, conducting an emergency shelter hearing, or scheduling a temporary hearing to establish support. Judges must be available to meet these critical needs on an expedited basis. Other cases may be appropriate for a "fast track." A "fast track" may include cases such as simplified dissolutions, dissolutions with a marital settlement agreement, or dependency actions sheltering a child. Some cases may be resolved more quickly and more economically by referring them to a quasi-judicial officer.
Case management staff is also responsible for collecting and reviewing aggregate data to evaluate the progress of all cases in the division. The Committee describes this responsibility as the caseflow monitoring function. This data will be used to make reports, determine compliance with time standards, and to evaluate how well the family division is operating.
In this case management model the judge is a coordinator and facilitator as well as an adjudicator. The "gatekeeper" function historically assumed by judges is shifted to court staff, thereby allowing judges to focus their efforts on making legal decisions. The simple technique of reviewing court files to determine if a case is ready for judicial action before scheduling it on a judge's calendar will maximize the use of judicial time, a scarce commodity in family court.
# 4(d) Technology. The court needs an integrated management information system to monitor and coordinate cases in the family division. The system should be integrated with the clerk of court and be able to provide information on all pending and closed cases involving the members of a family.
Specifically, the system should have the capacity to:
 provide automatic calendar management
 monitor significant case events and generate automatically an appropriate order or notice
 maintain a complete history of the family's involvement in the court system
 allow retrieval of documents contained in the court file
 capture statistical data needed for reports
 search for records involving the same parties in all counties of the state
 allow courtroom data entry as proceedings are conducted
 allow for teleconferencing and appearance of witnesses by electronic means
 allow interagency and public access to appropriate information

Commentary:
The Chair of the Family Court Steering Committee should appoint a Technology Subcommittee to work with the Trial Court Technology Subcommittee of the Technology Commission to establish a technology plan that meets the case management and coordination needs of the model family court. The family court's need for technology is a priority. Without appropriate technology, the court cannot obtain the information necessary to manage and coordinate cases effectively. Currently, clerical staff, employed by clerks of court, track and cross-reference cases manually. This is a time consuming process. It is difficult for them to keep up with the files and to determine when cases involving the same family members are pending in different divisions. Technology is available to automate these tasks. Ideally, the system should be integrated statewide *545 with law enforcement agencies, the Department of Children and Families, the Department of Juvenile Justice, and any other agencies that interact with the family court on a regular basis.
# 4(e) Model Court Diagram. The following diagram is a visual representation of how the model court will process public requests for information and assistance and manage and coordinate litigation.

Commentary:
Intake-This is the intake process described in recommendation 4(b). An intake specialist helps potential litigants and self-represented litigants assess their problem(s) and directs them to the most appropriate "door" (e.g., mediation, arbitration, litigation, and social services) for resolution. Attorneys may refer their clients to the intake office for information and service referral, but most represented litigants will enter the family court when their attorney files legal proceedings. Those cases will be screened by case management staff for service referral.
Service Referral-This is the referral process described in recommendation 4(b) and 4(c). It includes both automatic referrals and referrals based on a judicial order. The process includes monitoring compliance and ensuring that reports are filed, when appropriate. All cases will be screened and monitored as part of the service referral function. Initial screening will begin during intake for self-represented litigants and during case management for litigants represented by attorneys.
Case Management/Family Support Function-This represents the coordinated team approach to addressing each family's litigation (micro case management) through processes designed to facilitate the delivery of appropriate social services, maximize judicial resources, avoid conflicting orders, and prevent multiple court appearances on the same issues. See recommendation 4(a). Appropriate technology is essential to perform this function. See recommendation 4(d).
Caseflow Monitoring-This represents management of all family division cases in the aggregate (macro case management). Successful performance of this function is impossible without technology.
*546 
Recommendation # 5-Administrative Structure
#5(a) Local Rule. The Florida Supreme Court should require each circuit to implement a unified family division consistent with this model by a new local rule or administrative order approved by the Florida Supreme Court.

Commentary:
The Florida Supreme Court approved local rules and administrative orders in 1994. Family Courts II. These rules and *547 orders were drafted after a statewide family courts workshop in April, 1993, where the Florida Supreme Court explained its mandate to establish family divisions in each circuit. The Court did not tell the circuits how to implement family divisions, but gave the circuits some specific directions in Family Courts I and Family Courts II. Many of the proposals in the FCSC recommendations are reaffirmations of the Court's original directions to the circuits, including the role of family administrative judges, specialized education, case management, early service referral, and the need to assign related cases to the same judge whenever possible. Although the circuits were required to make annual reports on progress of their individual family initiatives, none of the circuits complied and the Florida Supreme Court did not follow up until 2000. Since 1993, the circuits have not received any direction or recommendations on implementing family divisions. At that time the circuits did not have the benefit of the FCSC's proposed model or continuing national research into how family courts should meet the needs of children and families. The local rules and administrative orders that were adopted previously should be revisited and redrafted to conform to these developments.
# 5(b) Administrative Judge. The Florida Supreme Court should require the chief judge of each circuit to appoint an administrative family law judge for the circuit and give the administrative judge authority to oversee and coordinate the circuit's family initiative. The chief judge may appoint associate administrative judges for individual counties or specialized divisions, such as domestic relations, domestic violence, juvenile dependency, or juvenile delinquency, but these associate judges shall report to the administrative judge of the family division.

Commentary:
The Florida Supreme Court directed appointment of an administrative judge who would be responsible to the chief judge and outlined the administrative judge's extensive responsibilities. The Supreme Court made family division administrative judges responsible for coordinating and implementing the family court concept in the circuit; developing policy, procedures and administrative orders to implement the circuit's plan; monitoring and reporting on the circuit's progress; developing resources to meet the court's need for services; developing and facilitating communications with court-related entities on policy; and developing a means to orient new judges to the family court concept. Family Courts II, 633 So.2d at 17-18. However, the Supreme Court did not direct chief judges to give the administrative judges any authority to carry out these directives or make it clear that judges in specialized divisions would report to the family division administrative judge. In some circuits, the chief judge appointed a family law administrative judge to comply with Family Courts II, but did not give the administrative judge any authority over how the family court was developed and operated in the circuit. Furthermore, the Supreme Court did not insist on one family law administrative judge for the circuit, so circuits with multiple counties may have several administrative judges who are responsible for family cases. Consequently, implementation of the family initiative has been inconsistent and disorganized within many circuits and among circuits in the state.
Justice Barbara Pariente, in her remarks to The Florida Bar Commission on Legal Needs of Children, reported that *548 "most circuits operate a juvenile division separate from the family division" and that an experienced court administrator observed that family divisions continue to operate "in a status quo fashion." The court administrator's most astute observation was, "there is no shared vision by members of the Judiciary and communication does not take place to share relevant case information and coordinate case events." Reaffirming the leadership role of administrative judges in the family initiative will help address these problems.
Most model family courts have a separate administration. See Hardin, Child Protection Cases in a Unified Family Court, 32 Fam. L.Q. 131, 149 (1998) (explaining the need for administrative control over judicial assignments and calendar). The Committee does not recommend a separate administration, but chief judges must grant family division administrative judges authority to fulfill the directives of the Florida Supreme Court. The Florida Supreme Court must ensure that chief judges do this.
# 5(c) Family Court Administrator. Each circuit should employ at least one family court administrator or coordinator to assist the chief judge, trial court administrator, and administrative family law judge in the management responsibilities of the family division and in establishing linkages with appropriate community services and programs.

Commentary:
The family court administrator will assist the chief judge and family law administrative judge to establish administrative unification in circuit family divisions and to mobilize community resources. The family court administrator will oversee the day-to-day implementation of the approved model family court in the circuit. The family court administrator will supervise all family division staff and assist in implementing programs or accessing resources that are essential to the family court. Duties may involve visiting a club or organization to obtain support for a family visitation center, traveling to another county in the circuit to help establish a procedure for assisting pro se litigants, or in coordinating case management processes with the clerk's office.
The legislature has funded many of our requests for family court personnel, but they are not sufficient to fully staff a family division. As a result, some positions have been used to fulfill a variety of circuit needs. The Florida Supreme Court should require a job description for each position that explains the employee's role in the family initiative. Then the family court administrator will be able to coordinate staff efforts to advance implementation of a model family court.
Recommendation # 6-Family Law Judges
# 6(a) Judicial Commitment. The Florida Supreme Court should require chief judges to assign to the family division only those judges who are committed to children and families, and, to the extent possible, who volunteer to serve in the division.

Commentary:
Judges assigned to the family division must have expertise in all matters involving children and families. They must be motivated to learn multi-disciplinary skills in the areas of domestic violence, family dynamics, child development, psychology, and mediation. Chief judges should give special consideration to the aptitude, demonstrated interest, and experience of each judge assigned to family court. Chief judges should be encouraged to refrain *549 from assigning new judges to dependency or delinquency unless the judge volunteers.
# 6(b) Term in the Division. The Florida Supreme Court should encourage chief judges to assign judges to the family division for at least a three-year term, give them the opportunity to rotate out at the end of their term, and stagger rotation to ensure that a significant portion of the family division judges are experienced in family law.

Commentary:
The Committee selected this time because it gives judges time to learn the multi-disciplinary skills of domestic and juvenile law and to establish working relationships with the agencies involved in family cases.
# 6(c) Preliminary Education. Judges who are assigned to the family division for the first time, or who have not served in the family division for two years, should receive mandatory training in the fundamentals of family law, domestic violence, juvenile dependency, and juvenile delinquency before assuming the assignment or within 60 days after assuming the assignment.

Commentary:
The FCSC requests the Florida Courts Educational Council to address the need for this education. Excellent courses in the fundamentals of family law, juvenile dependency, and juvenile delinquency are presented each year in May at the College of Advanced Judicial Studies. These classes are not sufficient. Class size is limited to twenty-five to thirty judges and because AJS lasts only one week, judges cannot attend classes in both domestic relations law and juvenile law.
Dependency cases are challenging and complex. They require judges with a deep understanding of child protection law, juvenile procedure and available treatment options. Judges must establish working relationships with the Department of Children and Families and a host of public and private agencies that work with the Department, the courts, and law enforcement. See Hardin, Child Protection Cases in a Unified Family Court, 32 Fam. L.Q. 131 (1998) for a good discussion on the needs of child protection cases in a unified family court. Because cases involving the same family will be coordinated within the family division, a judge could be assigned to hear a dissolution case, domestic violence case, and a dependency case involving the same family. For this reason, we must provide family judges with a broad range of judicial education.
# 6(d) Continuing Education. Judges serving in the family division should be provided with continuing education in technical legal requirements of domestic relations and juvenile law, training in non-legal subjects such as child development, family systems, mental health, behavioral sciences, social work, mediation, and information on public benefits and programs that are available for children and families.

Commentary:
Judges serving in the family division should be provided with abundant opportunities for training. Family law involves many disciplines besides law, so judges should be trained in the nonlegal aspects of their work. The Florida Supreme Court recognized that family division judges would need specialized training in subjects such as family mediation, child *550 custody law, child sexual abuse, psychological testing, and taxation. Family Courts I, 588 So.2d at 589. In 1991 much of the research on the needs of children and families was just beginning. Only recently, have studies provided empirical evidence on the importance of fathers to children's physical and psychological development. Studies involving attachment and alienation of children and parents are continuing. Florida judges should have the benefit of the most up-to-date information on these issues. Judges need to understand child development and attachment theory before deciding primary physical residence in a domestic relations case, or placement in a dependency proceeding. Judges need to understand the characteristics of alcohol and drug dependency and treatment for addiction before deciding whether a child should be reunited with a parent suffering from these problems. Judges need comprehensive education in the dynamics of domestic violence, power and control theory, and information on why anger management classes may endanger victims and their children before judges can make the best decision in a domestic violence case. Judges should have training in basic psychology before ruling on the credibility of psychiatric and psychological testimony. These are just a few examples of the educational needs of family judges.
Florida can provide most of this education in state, but family judges should be given preference in attending out-of-state family law education. Attendance at these conferences infuses the court with fresh ideas, provides the family law judge with a sense of importance and identity with other family court judges, helps avoid burnout, and offers an incentive for serving in the family division.
Recommendation # 7-Additional Family Court Staff
# 7(a) Staff Attorneys. Family division judges should have access to staff attorneys.

Commentary:
Staff attorneys review motions and pro se correspondence, research legal issues, and prepare written orders under the direction of the judge. One of the most precious resources in the family court is docket time. Staff attorneys can be used to manage a motion calendar, so that judges can rule on issues without a hearing when it is unnecessary to take testimony.
# 7(b) Education and Training.
(1) Quasi-judicial officers should receive mandatory training in the fundamentals of family law, domestic violence, juvenile dependency and juvenile delinquency before assuming the assignment or within 60 days after assuming the assignment. They should be provided with continuing education in the area of assignment.
(2) All court staff should be well trained in both the family court operations as well as child development, family systems, mental health, behavioral sciences, social work, mediation, and information on public benefits and programs that are available for children and families.

Commentary:
The family division has a unique need for staff that is not shared by other divisions. Many family cases do not end when the judge enters a final judgment. Unlike other circuit divisions, family courts have a significant domestic relations post-judgment caseload, averaging one-fourth to one-third of a family court's entire caseload. Many of these cases involve self-represented *551 litigants who return to court repeatedly on enforcement and modification issues. Dependency cases must be monitored closely to ensure that all time standards are followed. In domestic violence cases judges must fill out injunction forms that include findings used to calculate child support and specific visitation arrangements to protect the family. Having clerical staff to handle these matters extends judicial resources and allows judges to concentrate on making judicial decisions.
Recommendation # 8-Family Law Advisory Group
The Florida Supreme Court should require each circuit (county) to create a family law advisory group that is open to court staff, judges, members of the bar, social service providers, local community leaders and any other interested persons or organizations to support and advise the family court.

Commentary:
A family law advisory group provides an open forum for resolving complaints about the judicial system, interagency conflicts, and family court policies. It can be used to provide public education to participating agencies and the clients they serve as a foundation for marshaling public support for court programs and policies, and for facilitating transition into a unified family court. A family law advisory group fulfills the Florida Supreme Court's direction to develop and facilitate "communications with court-related entities on policy with respect to family cases, e.g., state attorneys, public defenders, Health and Rehabilitative Services, community social services entities, clerks of court," and others. Family Courts II.
Recommendation # 9-Public Education
The Florida Supreme Court should require each circuit to provide regular public information through the Internet and any other media that is easily accessible to the community about how to access the court, what services are available, what the public can expect from the legal system, and any limitations on the court's authority and resources.

Commentary:
Information about our legal system should be easily available to all citizens. The public has a poor perception of the legal system, which many view as expensive, time consuming, and inaccessible. We can address some of their concerns by providing information about the legal system and explaining any limitations on the court's authority and resources. Family judges and staff should be encouraged to accept speaking engagements to talk with citizens about these issues. These efforts will help restore trust and confidence in the legal system and the judiciary.
Recommendation # 10-Family Court Summit
The Family Court Steering Committee should sponsor a Family Court Summit to develop plans to implement the Court's goals for the family court initiative.

Commentary:
The Florida Supreme Court should convene the summit to emphasize its importance and to illustrate their commitment to the family initiative. The Court required family divisions in 1991, but it was not until the Family Courts Workshop in 1993 that most circuits began a local initiative. These local efforts were the direct result of leadership from the Florida Supreme Court, especially Justice Ben Overton and Justice Rosemary Barkett. Following the workshop, circuits drafted local rules and *552 administrative orders that were approved by the Court in 1994 without much study. Since then there has been no formal follow-up or reevaluation of circuit initiatives. See comments on local rules in recommendation # 4(a). The summit will allow the Florida Supreme Court to revitalize the family initiative and reaffirm the importance of implementing a model family court in each circuit.
At the summit, FCSC can disseminate the results of the Family Court Assessment Project and inform the circuits that $500,000 in pilot money will be available for the purpose of establishing models of best practices in case management and coordination and in developing community services to support the family court.
 Respectfully submitted this 29th day
 of June, 2000.
 Family Court Steering Committee
 1998 2000 FAMILY COURT STEERING
 COMMITTEE
The Honorable Karen K. Cole, Chair
Circuit Judge, Fourth Judicial Circuit
The Honorable Robert P. Cates
Chief Judge, Eighth Judicial Circuit
The Honorable Daniel Dawson
Circuit Judge, Ninth Judicial Circuit
The Honorable Robert L. Doyel
Circuit Judge, Tenth Judicial Circuit
Ms. Jane L. Estreicher
Attorney at Law, St. Petersburg
The Honorable Kerry Evander
Circuit Judge, Eighteenth Judicial Circuit
Mr. Tom Genung (2000)
Family Court Administrator, Seventeenth
Judicial Circuit
The Honorable Hubert Grimes
Circuit Judge, Seventh Judicial Circuit
The Honorable Raymond O. Gross (1999
00)
Circuit Judge, Sixth Judicial Circuit
The Honorable James C. Hauser
Circuit Judge, Ninth Judicial Circuit
Ms. Gay Inskeep
Chief Deputy Court Administrator, Sixth
Judicial Circuit
The Honorable Sandra Karlan
Circuit Judge, Eleventh Judicial Circuit
The Honorable Kathleen Kearney
Secretary, Department of Children &
Families
Mr. Jeffrey Kielbasa
Taxpayer Rights and Intergovernmental
Advocate Department of Revenue
The Honorable Nellie Khouzam (1999 00)
Circuit Judge, Sixth Judicial Circuit
The Honorable Judy Kreeger
Circuit Judge, Eleventh Judicial Circuit
The Honorable John Lenderman
Circuit Judge, Sixth Judicial Circuit
The Honorable Karen Martin (1998 99)
Circuit Judge, Fifteenth Judicial Circuit
Mr. Caroll L. McCauley
Attorney at Law, Panama City
The Honorable Raymond T. McNeal
Circuit Judge, Fifth Judicial Circuit
The Honorable Richard B. Orfinger
Chief Judge, Seventh Judicial Circuit
Ms. Carol Ortman (1998 99)
Trial Court Administrator, Seventeenth
Judicial Circuit
Ms. Beverly Parker
Attorney at Law, Fort Lauderdale
Ms. Linda Radigan
Assistant Secretary, Department of Children
and Families
The Honorable George Reynolds
Chief Judge, Second Judicial Circuit
Ms. Margaret E. Ross
Deputy Court Administrator, First Judicial
Circuit
Mr. Walt Smith
Trial Court Administrator, Twelfth Judicial
Circuit
The Honorable Hugh E. Starnes
Chief Judge, Twentieth Judicial Circuit
The Honorable Thomas Stringer, Sr. (1998
99)
Circuit Judge, Thirteenth Judicial Circuit
The Honorable Sandra F. Taylor
*553
Chief Judge, Sixteenth Judicial Circuit
The Honorable Terry Terrell
Circuit Judge, First Judicial Circuit
Ms. Harriett Williams
General Master, Second Judicial Circuit
Mr. Tom Willis
Trial Court Administrator, Nineteenth Judicial
Circuit
Justice Ben Overton, Supreme Court Liaison
(1998)
Justice Barbara Pariente, Supreme Court
Liaison (1998 2000)
OSCA STAFF
Ms. Jacinda (Jo) Haynes Suhr, Program
Manager
Ms. B. Elaine New, Senior Attorney
Ms. Sondra Williams, Senior Court Analyst
Ms. Traci Paterson, Senior Court Analyst
Ms. Mignon (Dee) U. Beranek, Deputy
State Court Administrator
Ms. Patricia Badland, DCIP Program
Manager
NOTES
[1] The Committee that submitted the unanimous recommendations in June 2000 was chaired by The Honorable Karen Cole, Circuit Judge, Fourth Judicial Circuit. The Committee is currently chaired by The Honorable Raymond T. McNeal, Circuit Judge, Fifth Judicial Circuit. The other members of the 1998-2000 Committee were: The Honorable Robert P. Cates, Chief Judge, Eighth Judicial Circuit; The Honorable Daniel Dawson, Circuit Judge, Ninth Judicial Circuit; The Honorable Robert L. Doyel, Circuit Judge, Tenth Judicial Circuit; Ms. Jane L. Estreicher, Attorney at Law, St. Petersburg; The Honorable Kerry Evander, Circuit Judge, Eighteenth Judicial Circuit; Mr. Tom Genung (2000), Family Court Administrator, Seventeenth Judicial Circuit; The Honorable Hubert Grimes, Circuit Judge, Seventh Judicial Circuit; The Honorable Raymond O. Gross (1999-00), Circuit Judge, Sixth Judicial Circuit; The Honorable James C. Hauser, Circuit Judge, Ninth Judicial Circuit; Ms. Gay Inskeep, Chief Deputy Court Administrator, Sixth Judicial Circuit; The Honorable Sandra Karlan, Circuit Judge, Eleventh Judicial Circuit; The Honorable Kathleen Kearney, Secretary, Department of Children and Families; Mr. Jeffrey Kielbasa, Taxpayer Rights and Intergovernmental Advocate Department of Revenue; The Honorable Nellie Khouzam (1999-00), Circuit Judge, Sixth Judicial Circuit; The Honorable Judy Kreeger, Circuit Judge, Eleventh Judicial Circuit; The Honorable John Lenderman, Circuit Judge, Sixth Judicial Circuit; The Honorable Karen Martin (1998-99), Circuit Judge, Fifteenth Judicial Circuit; Mr. Caroll L. McCauley, Attorney at Law, Panama City; The Honorable Richard B. Orfinger, Chief Judge, Seventh Judicial Circuit; Ms. Carol Ortman (1998-99), Trial Court Administrator, Seventeenth Judicial Circuit; Ms. Beverly Parker, Attorney at Law, Fort Lauderdale; Ms. Linda Radigan, Assistant Secretary, Department of Children and Families; The Honorable George Reynolds, Chief Judge, Second Judicial Circuit; Ms. Margaret E. Ross, Deputy Court Administrator, First Judicial Circuit; Mr. Walt Smith, Trial Court Administrator, Twelfth Judicial Circuit; The Honorable Hugh E. Starnes, Chief Judge, Twentieth Judicial Circuit; The Honorable Thomas Stringer, Sr. (1998-99), Circuit Judge, Thirteenth Judicial Circuit; The Honorable Sandra F. Taylor, Chief Judge, Sixteenth Judicial Circuit; The Honorable Terry Terrell, Circuit Judge, First Judicial Circuit; Ms. Harriett Williams, General Master, Second Judicial Circuit; and Mr. Tom Willis, Trial Court Administrator, Nineteenth Judicial Circuit.
[2] We published these recommendations for an extended 90-day comment period and received few comments in response. The Board of Directors of Florida Legal Services and the Family Court Advisory Committee from the Fifth Judicial Circuit endorsed the recommendations in total. The Governor's Task Force on Domestic Violence also supported all of the recommendations, but suggested additional guiding principles. Comments raising concerns with specific recommendations were received from Tallahassee attorney Paula L. Walborsky, Viera attorney Blaise Trettis, the Florida Public Defender Association, the Eleventh Judicial Circuit, and the Florida Bar Rules of Judicial Administration Committee.
[3] As of calendar years 1998 and 1999, these cases constituted the largest percentage of all circuit court filings-over 40%. For this same time period, these cases overwhelmingly represented the largest percentage of circuit court reopeningsalmost 70%.
[4] The statewide workshop consisted of a delegation from each judicial circuit, and included chief judges, judges handling dissolution of marriage cases and attendant matters, judges handling juvenile dependency and delinquency cases, trial court administrators, and selected court support staff. See id. at 17.
[5] In 1994, the Court issued a third opinion "to clarify issues regarding the implementation and operation of family law divisions" with specific regard to domestic violence injunctions. See In re Report of the Comm'n on Family Courts, 646 So.2d 178 (Fla.1994) ("Family Courts III"). In that opinion, the Court held "that the implementation of family law divisions and the assignment of all family law matters, including domestic violence, are to be controlled through either local rules or administrative orders expressly approved by this Court." Id. at 182. In addition, the Court "expressly approve[d] the local rules and administrative orders establishing family law divisions in each of the circuits" as identified in the appendix attached to the opinion. Id.
[6] These same themes were echoed in a subsequent statewide conference sponsored by this Court in 1996. This 1996 conference was designed to address how Florida's courts can best respond to the increased number of pro se litigants appearing in family matters.
[7] We also recognize, however, that juvenile dependency cases have increasingly required more judicial time and attention because of the multiple statutory requirements that are aimed at protecting the best interests of the child and minimizing the time that the child remains in foster care. See In re Certification of Need for Additional Judges, 780 So.2d 906, 909 (Fla.2001) (explaining how changes in the law have led to a substantial increase in the amount of judicial time and court resources necessary to handle the dependency caseload).
[8] The additional guiding principles suggested by the Task Force are: safety for all victims; holding perpetrators of violence accountable for their actions; safety and accountability should be the primary focus of the court system; and policies should acknowledge the role domestic violence perpetrators' relationships and pattern of violence can influence courtroom policies.
[9] The judges who signed the comment were: Chief Judge Joseph P. Farina; Administrative Judge (Domestic Violence Division) Amy Karan; Administrative Judge (Family Division) Richard Feder; Administrative Judge (Juvenile Division) Cindy Lederman; Associate Administrative Judge (Family Division) Joel H. Brown; and Associate Administrative Judge (Juvenile Division) Lester Langer.
[10] The terms "cross-over cases" and "related cases" as used in the family law arena refer to situations in which one family is involved in more than one pending case at the same time.
[11] According to a recent study of domestic relations cases conducted in Dade County, although 65% of those cases began with at least one party unrepresented, by the time of the final judgment, that percentage had risen to 85%.
[12] This Court remains committed to exploring other methods to ensure meaningful access to the courts for unrepresented litigants and accordingly has appointed an Access to Justice Task Force for this purpose. The Court also has requested that The Florida Bar study the issue of unbundled legal services; i.e., where an attorney is retained to give advice of a limited scope or on a discrete matter. The Court anticipates receiving reports from both the Task Force and The Florida Bar in the near future on these issues.
[13] We do note that in response to the need for additional resources for the family courts of this State, the Legislature established the Family Courts Trust Fund in 1994. See ch. 94-222, Laws of Fla. (codified in § 25.388, Fla. Stat. (2000)). The trust fund is funded from a $25 fee on marriage licenses and a $25 additional charge on filing fees for dissolution of marriage. See §§ 28.101, 741.01(4) Fla. Stat. (2000). Over $4.5 million was appropriated from the trust fund for family courts in FY 2000-01. See ch.2000-166, items 2708 and 2710, Laws of Fla. Thus, this fund provides a partial source of financial support for the family court system.
[14] Although it is beyond the scope of this opinion to address the source of this funding, we note that a 1998 constitutional amendment to Article V of the Florida Constitution shifts to the State many of the costs of funding the court system. Nonetheless, this amendment does not necessarily mean that all of the essential elements set forth in the model family court will be funded through the budget of the state court system. At the present time, for example, supervised visitation has been funded, to the extent that state funding has been provided, through the Department of Children and Families.
[15] A graphic diagram of the model is provided in the appendix to this opinion, as part of Recommendation # 4(e).
[16] The Court has requested the Trial Court Technology Subcommittee of the Supreme Court's Technology Commission to consider the implementation of a uniform case management system for use by all circuits for family court cases. This requires an evaluation of the automation systems currently used to determine appropriate standards, necessary resources, and what is necessary to enhance the ability of the system. Outside the Court, The Florida Bar Commission on Children has identified technology as a priority and currently has received a grant to create a snapshot of the current state of technology as it relates to children's issues, to identify and facilitate the various statewide technology initiatives as they may relate to children's issues, and to develop a common vision regarding the functional requirements of a technology system in a family court. Finally, the Sixth Judicial Circuit's model family court implementation grant, awarded in December 2000 through funding received from the Legislature, includes development of software with which to track families and cases.
[17] Rule 2.050(b)(3) provides in pertinent part:

The chief judge shall be the chief judicial officer of the circuit, shall maintain liaison in all judicial administrative matters with the chief justice of the supreme court, and shall develop an administrative plan for the efficient and proper administration of all courts within that circuit.
[18] Rule 2.050(b)(4) provides that "[t]he chief judge shall assign judges to the courts and divisions, and shall determine the length of each assignment."
[19] The Florida Public Defender Association indicates that it endorses Attorney Trettis's comments regarding his concerns over any endorsement by the judicial system of one theory of domestic violence to the exclusion of other theories.
[20] Alternatively, each county within a circuit could elect to form its own Family Law Advisory Group, if that is preferable for the individual circuit.
[21] The Florida Supreme Court's website is located via the Internet at http:// www.flcourts.org/. Family Law information that can be found on that website includes the Florida Family Law Rules of Procedures Forms, the Florida Supreme Court Approved Family Law Forms, the phone number and email address of the forms contact person at the Florida Supreme Court, general information for self-represented litigants, the Family Law Rule and Opinions, and Links to Family Law Resources. Many of the judicial circuits also have websites containing information on family courts and pro se representation and those websites can be accessed from the Florida Supreme Court's website.